UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| Jeffrey L. Williams, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  1:07-cv-1462-WTL-TAB |
| | ) | |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## Entry Remanding Commissioner's Decision

Plaintiff Jeffrey L. Williams brings this action under 42 U.S.C. § 405(g) seeking review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for disability insurance benefits.  Acting for the Commissioner, an administrative law judge ("ALJ") found on February 22, 2007, that Mr. Williams was not disabled and denied his claim for benefits.  The Appeals Council subsequently denied Mr. Williams's request for review; he then filed this civil action for judicial review of the Commissioner's final decision.  For the reasons explained below, this Court remands this case to the Commissioner.

### Background

At the time of his administrative hearing on January 12, 2006, Mr. Williams was 42 years old, weighed 196 pounds, was 5'7" tall, and had a high school degree.  He was married and lived with his wife and two children, aged 18 and 13.  Mr. Williams believed his impairments were related to an accident in the spring of 2004; while he was using a chain saw to cut down a tree, the saw jerked and flipped him onto his back.  He went to the hospital that day, but doctors did not discover any problems.

Prior to that accident, on August 18, 2003, Dr. Simchak, a neurologist, first examined Mr. Williams to evaluate his recurring near syncopic episodes.[1] Mr. Williams reported that his first episode was on July 15, 2003, and that he had had eight to ten episodes before his appointment. Each episode lasted five to ten seconds and involved a feeling of heat rushing to his head followed by a blank stare with a feeling of coldness, but with no loss of consciousness. He felt drained afterward. MRI scans, Holter monitoring,[2] a chest x-ray, and an EKG did not indicate any cause for these episodes. Mr. Williams had previously experienced frequent migraine headaches, but those had improved, and he was taking prescription medication as needed for them.

Mr. Williams saw Dr. Simchak again on September 10, 2003, for the earlier recurring episodes of near syncope, although he had not experienced any since his previous appointment the month before. Tests indicated normal neurological functioning. Mr. Williams had the full range of motion in his neck, and his strength throughout was equal, but he had begun to experience some right arm pain and weakness while using a paint gun at work. Dr. Simchak prescribed physical therapy. Mr. Williams often could not move the day after he had completed physical therapy.

Mr. Williams's last day of physical work was May 5, 2004. He had worked in a factory for 21 years, and his last assignment involved lifting dies weighing 50-100 pounds. After he quit working, his family doctor diagnosed him as depressed and prescribed an antidepressant. The

---

[1] A "syncopic episode" is the loss of consciousness and postural tone caused by diminished cerebral blood flow. *Stedman's Medical Dictionary* at 1887 (28th ed. 2006).

[2] "Holter monitoring" is a technique for long-term, continuous, usually ambulatory recording of electrocardiographic signals on magnetic tape for scanning and selection of significant but fleeting changes that might otherwise escape notice. *Stedman's Medical Dictionary* at 1222.

2

doctor told him that his depression was caused by the fact that he was not working and was inside all of the time, and by a chemical imbalance caused by diabetes.

Mr. Williams's next visit to Dr. Simchak was on June 23, 2004. He complained of pain in his shoulders, knees, and elbows, and also reported muscle spasms and extreme fatigue. He stated that if he sustained any activity for 30 minutes or more he could not do anything else for two days. Dr. Simchak could not determine the cause of the symptoms and ordered more testing.

Dr. Simchak next examined Mr. Williams on July 7, 2004, and diagnosed him with neurocardiogenic[3] syncope, thrombocytosis,[4] fatigue, and joint pain. Dr. Simchak prescribed medication for his syncope and recommended a high salt diet.

When Mr. Williams next saw Dr. Simchak on August 4, 2004, he reported that had had no syncopic episodes, but that he had had more back pain accompanied by sweating, dizziness, and lightheadedness. Dr. Simchak believed that Mr. Williams's back pain had been caused by the heavy lifting that he had done at work.

Mr. Williams next saw Dr. Simchak on September 2, 2004, when Mr. Williams reported that his back pain was the same despite physical therapy. Dr. Simchak described his strength as equal throughout his body and his gait as steady. Dr. Simchak recommended a lumbar epidural block for his facet arthropathy. Dr. Simchak wrote a note for Mr. Williams that said he should not return to any work until at least September 30, 2004.

Mr. Williams received an epidural injection on September 14, 2004. He reported that prolonged sitting or standing increased the pain and that he could only do either for 30 minutes. Sometimes his back locked, and he would have a shooting pain from his left groin area to his

---

[3] "Neurocardiogenic" refers to conditions relating to the nerve supply of the heart. *Stedman's Medical Dictionary* at 1309.

[4] "Thrombocytosis" is an increase in the number of platelets in the circulating blood. *Stedman's Medical Dictionary* at 1984.

knee. His pain often improved with rest. On September 30, 2004, Mr. Williams reported to Dr. Simchak that the epidural injection had given him only temporary relief and that he was still having problems with his back. Mr. Williams had not had any syncopic episodes since at least July. An examination revealed that Mr. Williams had limited range of motion in his spine, but that his strength was still equal throughout.

Another epidural steroid injection on October 5, 2004, provided temporary pain relief. Mr. Williams reported that the pain was so severe that he could not work and that lifting, twisting, or turning made the pain worse. The only time he felt relief was with rest at night.

When Mr. Williams next saw Dr. Simchak on November 11, 2004, he reported that he had experienced weakness in both legs, particularly in his left leg. An EMG of the legs was normal. Dr. Simchak noted that Mr. Williams's symptoms seemed to increase without any definite cause.

On December 1, 2004, Mr. Williams saw Dr. Simchak and did not report any syncopic episodes. He had begun to experience more weakness in his legs, as well as pain and numbness, but no medical explanation for those symptoms was found. Dr. Simchak prescribed pain medication and a TENS unit.

Mr. Williams coached fifth and sixth grade basketball in December 2004 to February 2005. He had one syncopic episode while coaching. He had to wear his TENS unit while coaching at practices and games.

During Dr. Simchak's next examination on January 13, 2005, Mr. Williams said that the pain in his lower back continued and the pain medication did not seem to help, but the TENS unit provided some relief. His reflexes in his lower extremities were good.

On March 23, 2005, Mr. Williams reported to Dr. Simchak that his back pain had increased and he was having pain in his groin, abdomen, and legs. The TENS unit provided some relief. His left side hip seemed to be weaker than his right and his walking was slower. A few days later, Mr. Williams reported that he now hurt when he turned in any direction and that he could not find a comfortable position.

Dr. Simchak referred Mr. Williams to Dr. Kincaid for a second opinion on April 6, 2005. Mr. Williams reported to Dr. Kincaid that his pain radiated to his leg on his left side and to his knee on his right side. The pain increased when he stood or sat for long periods. He could only lie down for about an hour before he would have to sit slightly tilted up. His knees swelled when the pain was the worst. Dr. Kincaid thought that Mr. Williams had a cervical spinal cord disorder, but an MRI did not reveal any problem. Dr. Kincaid concluded that returning to work would be dangerous for Mr. Williams.

Dr. Simchak also referred Mr. Williams to Dr. Mobasser, whom Mr. Williams saw on April 29, 2005. Dr. Mobasser also concluded that an MRI of the spine did not show any problems, but that degenerative discs could account for some neck pain; however, he did not see any explanation for the weakness Mr. Williams complained of. Dr. Mobasser concluded that surgery would not benefit Mr. Williams.

After an examination on May 4, 2005, Dr. Simchak concluded that Mr. Williams's condition had not improved and that he should see a pain specialist.

Disability Determination Service (DDS) doctors conducted a physical residual functional capacity (RFC) assessment and diagnosed Mr. Williams on May 10, 2005, with cervical spine disorder and disc bulges. They determined that he could occasionally lift 20 pounds, frequently lift 10 pounds, stand, walk, or sit about six hours in an eight-hour workday, and was not limited

in pushing or pulling.  They found that he had a limited range of motion in his neck and his only postural limitation was climbing.  The work limitations because of his syncopic episodes included avoiding exposure around heights, machinery, and uneven or wet surfaces.  A psychiatric evaluation by DDS the next day examined him for medical impairments under Listing 12.04 (Affective Disorders) and found that his functional limitations were none to mild.

Dr. Simchak wrote a general letter on behalf Mr. Williams on June 21, 2005, that stated he had been treating Mr. Williams for a while and concluded that he was permanently disabled.  He reported that surgery would not be beneficial and that Mr. Williams needed to be treated for chronic pain.

On August 25, 2005, Dr. Simchak concluded that Mr. Williams could not drive because he could not turn his head and that his pain was becoming worse.  After being prescribed Oxycontin, Mr. Williams reported that it reduced his pain from a level of ten to four.

**Administrative Hearing**

The administrative hearing before an ALJ for Mr. Williams's disability insurance benefits application was on January 12, 2006.  Mr. Williams testified that he was mostly confined to home but was able to care for himself and to help with household chores of cleaning and cooking.  He sometimes cut wood for the fireplace and mowed the yard.  He also stated he often walked the family's 92-pound dog two to three times a day, walking 300 feet, resting on a bench for awhile, and then walking back.  He estimated that he could lift 15 pounds, although lifting a gallon of milk (which weighs eight pounds) sometimes stressed his body.

He stated that the TENS unit helped him to be mobile, and he described his pain as averaging between a four and an eight.  His legs felt numb when he sat for a while, and he had started using a cane to help him keep his balance.  Mr. Williams had to stand once during the

hearing and lean against a wall. He testified that he could not turn his head all the way to the right, but he could turn his head to the left.

The consulting medical expert testified that he discounted Mr. Williams's complaints of pain and found that he was not disabled because the pain was not consistent. The expert also discounted the reported weakness because Mr. Williams still retained some strength and those reports also were not consistent. The expert agreed with the physical RFC that Mr. Williams should be limited to doing light work with no repetitive twisting and no exposure to cold, heat, humidity, or vibration, as well as no heights because of the history of syncopic episodes.

Mr. Williams had never seen any mental health specialist for the depression his family doctor found. The consulting psychological expert testified that there was nothing to contradict the psychiatric review form that any depression was a non-severe disorder.

The vocational expert (VE) testified that Mr. Williams could satisfy the criteria for semi-skilled light work. Considering the limitations set by the medical expert, the VE concluded that 48,608 jobs existed nationally for someone with Mr. Williams's limitations and skill rating.

### Submission of Additional Evidence

After the hearing, Mr. Williams submitted additional medical records for review. These included the cervical spine RFC questionnaire completed by his treating neurologist, Dr. Simchak, as well as additional treatment records from a pain specialist, Dr. Loyd.

Dr. Simchak's RFC questionnaire completed on March 16, 2006, provided a far different conclusion than that of the DDS doctors' RFC assessment. Dr. Simchak found that Mr. Williams was unable to work, could rarely lift less than 10 pounds, was incapable of even low stress jobs, constantly felt pain severe enough to interfere with attention and concentration, and that his condition would last at least 12 months.

Dr. Simchak referred Mr. Williams to Dr. Lloyd, a pain specialist, who first saw him after the hearing before the ALJ. Dr. Lloyd diagnosed Mr. Williams with cervicalgia, lumbar spondylosis with facet disease, and a history of syncope. He prescribed a series of epidural injections in his cervical spine area, which provided significant relief of his neck and upper back pain. Dr. Lloyd stated that it was difficult to predict how long this relief would last, and he would be unwilling to perform any further epidural injections unless Mr. Williams's diabetes was under control, because the injections had an adverse effect on his blood sugar levels.

For Mr. Williams's lower back pain, Dr. Lloyd performed a lumbar medial branch block and lumbar radiofrequency ablation.[5] After these procedures, in May 2006, Mr. Williams reported that he had greater than 80% pain relief, which increased to 100% relief if he took over-the-counter pain medication. At worst, he reported his pain at a level of four, and he was able to operate his riding mower and drive his car for several hours for the first time in years. He felt pain in his neck that was a sharp sensation when he turned his head to the right or bent his body to the right. Dr. Lloyd explained that the lumbar block could be expected to last for a minimum of six months and that "quite often patients will develop better body mechanics which will allow the facts to heal while in the pain-free state" but that the lumbar radiofrequency ablation procedure could safely be repeated if healing did not occur and the pain returned.

## Standard of Review

The ALJ's findings of fact are conclusive and must be upheld "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind

---

[5] "Lumbar radiofrequency ablation" is the application of heat generated by radiant energy to kill or stun nerve cells in the lower back where pain originates. *Stedman's Medical Dictionary* at 3, 1121, 1622-23.

might accept as adequate to support a conclusion," *id*., and a court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423 (d)(1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but any other kind of gainful employment that exists in the national economy, considering his age, education, and work experience. *Id*. at § 423(d)(2)(A).

In determining whether a claimant is disabled, the agency applies a five-step sequential analysis: 1) is the claimant presently unemployed; 2) is the claimant's impairment or combination of impairments severe; 3) does the impairment meet or exceed any of the list of specific impairments that the Secretary acknowledges to be so severe as to preclude substantial gainful activity; 4) if the impairment is not specifically listed, is the claimant able to perform his former occupation; and, 5) if the claimant cannot perform his past work, is the claimant unable to perform other work in the national economy in light of age, education, and work experience. 20 C.F.R. §404.1520. Except for step three, a negative finding at any step precludes a finding of disability. *Young v. Secretary of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992). If the answer is affirmative at steps one, two, or four, the reviewer proceeds to the next step. *Id*. An affirmative answer at steps three or five results in a finding of disability. *Id*.

When an ALJ recommends that the agency deny benefits, he must first "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).  In other words, the ALJ must rest his denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Id*.

## Discussion

At step one, the ALJ found that Mr. Williams had not engaged in substantial work activity since his alleged onset date of May 4, 2004.  At step two, the ALJ determined that Mr. Williams suffered from the severe impairments of disorders of the back and diabetes.  The ALJ did not find at step three that Mr. Williams had an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1.  At step four, the ALJ found that Mr. Williams had acquired work skills from past relevant work that would be transferable to other occupations with jobs existing in significant numbers in the national economy.  Based on his analysis, the ALJ found that Mr. Williams was not disabled.  Acting for the Commissioner, the Appeals Council denied Mr. Williams's request for review.

Mr. Williams challenges the Commissioner's decision as flawed for primarily three reasons:  (1) the Commissioner erred in failing to assign controlling weight to Dr. Simchak's opinions; (2) the Commissioner erred in assessing RFC; and (3) the Commissioner erred in evaluating the supplemental medical evidence that was submitted after the hearing.  For the reasons explained below, this Court finds that Issue 3 is determinative because the ALJ did, in fact, err in his consideration of the supplemental evidence.  Because that error tainted the ALJ's

RFC assessment, and also affected the weight the ALJ assigned to Dr. Simchak's opinion, remand is necessary for the Commissioner to reevaluate all of the issues raised by Mr. Williams.

The ALJ considered and relied upon the supplemental medical evidence in determining Mr. William's RFC, but he did not consult with a medical expert or otherwise obtain medical evidence regarding the import of the new evidence. An ALJ must consult a medical expert if that is necessary to provide an informed basis for determining whether the claimant is disabled. *See* 20 C.F.R. § 416.927(a)(3); *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000). An ALJ must not "play doctor" and make his own independent medical findings. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).

As noted above, after the administrative hearing, Mr. Williams submitted additional medical records from Dr. Loyd, who had begun treating Mr. Williams after the hearing. Mr. Williams had experienced significant relief from his next pain from cervical epidural steroid injections and significant back pain relief from lumbar medial branch blocks and radiofrequency ablation. However, it was uncertain how long the relief would last, and Dr. Lloyd was unwilling to repeat the epidural injections unless Mr. Williams's diabetes was well-controlled. Further, after the radiofrequency ablation Mr. Williams reported a stabbing pain in his neck whenever he turned to the right, which Dr. Lloyd referred to as untreated cervicalgia.

The ALJ's February 22, 2007, decision discussed Dr. Loyd's treatment of Mr. Williams in 2006. The ALJ cited Dr. Loyd's records in April and May 2006 as evidence that not only showed an improvement in Mr. Williams's condition, but as evidence that rendered the earlier complaints of pain and physical limitations irrelevant. The ALJ found that Mr. Williams's condition five days after the radiofrequency ablation was sufficient to find that Dr. Simchak's physical RFC assessment completed in March 2006 was not entitled to considerable weight. The

ALJ discounted Mr. Williams's complaint of "burning pain" before the radiofrequency ablation because Mr. Williams had not had that complaint five days after the procedure.  In short, the ALJ discounted all evidence that existed before April 2006 because of the results of the medical procedures performed after that time.  The ALJ did not address Mr. William's report of  neck pain (cervicalgia) after the radiofrequency ablation.

The ALJ relied on Mr. Williams's reported improvement to find that the symptoms that existed before the procedure were no longer relevant in assessing RFC because the pain was "well controlled."  To reach this conclusion, the ALJ relied on Dr. Loyd's note that the radiofrequency ablation and steroid injections could be performed again in the future.  The ALJ apparently believed that any failure of the procedures to produce long-term benefits could be remedied merely by repeating them, despite Dr. Loyd's stipulation that he would not repeat any steroid injections until Mr. Williams's diabetes was controlled.  Further, the fact that Dr. Lloyd noted that more injections and radiofrequency ablation procedures would likely be necessary casts doubt on the long-term nature of the relief.  Significantly, the ALJ made no mention that Mr. Williams continued to suffer from significant neck pain after the radiofrequency ablation.  The ALJ's decision is therefore not supported by substantial evidence of record, especially in light of the fact that he failed to obtain expert medical opinion on the lasting effect of the treatments and whether Mr. Williams would be able to control his diabetes sufficiently to permit further treatments.

It could be that the results of Dr. Loyd's March through May 2006 procedures were entitled to more weight than all of the previous two years of evidence that showed significant limitations and impairments.  It also could have been that the ALJ would have found Mr. Williams not to be disabled even in the absent of the subsequent treatment reflected in the

supplemental evidence. However, the ALJ's decision indicates that he was influenced by what he may have perceived as the curative effect of the subsequent treatment, a perception that is not supported by the record as it stands. Absent medical evidence to confirm the conclusions the ALJ drew from the supplemental medical evidence, his decision is not supported by substantial evidence.

## Conclusion

For the foregoing reasons, the Commissioner's decision is remanded for further proceedings and findings consistent with this Order.

SO ORDERED: 03/23/2009

_William T Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana


Copies to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov,pearlie.wadlington@usdoj.gov,lin.montigney@usdoj.gov

Annette Lee Rutkowski
KELLER & KELLER
annette@2keller.com